**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **ROBERT GARY,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: PWG-15-1998** |
| | * | |
| **USAA LIFE INSURANCE CO.,** | * | |
| **Defendant.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

When the Plaintiff, Colonel Robert Gary, made a claim for benefits under a life insurance

policy (the "Policy") that Defendant USAA Life Insurance Co. ("USAA Life") had issued to his

wife Angela Maddox-Gary less than two years earlier, USAA Life denied his claim because Ms.

Maddox-Gary had made a misrepresentation in the medical questionnaire interview ("Medical

Questionnaire") that was part of the application process for the Policy.  Gary filed suit against

USAA Life to recover benefits under the Policy.  USAA Life moved for summary judgment,

insisting that Ms. Maddox-Gary's misrepresentation was material and therefore provided a basis

for USAA Life to rescind the Policy.  Def.'s Mot., ECF No. 29; Def.'s Mem. 5, ECF No. 29-1.

Gary filed a cross-motion for summary judgment, ECF No. 32, admitting that Ms. Maddox-Gary

made the misrepresentation but arguing that, "[u]nder the applicable statutes, USAA Life is

precluded from declaring Ms. Maddox-Gary's policy void because of failure to disclose an

Echocardiogram."  Pl.'s Opp'n & Mem. 4, ECF No. 32-2.[1]  He also contends that the Medical

Questionnaire is not part of the application but rather inadmissible hearsay that could not alter

---

[1] The parties fully briefed the motions, ECF Nos. 29-1, 32-2, 33, 34, and submitted a Joint
Record with their exhibits, ECF No. 36.  A hearing is not necessary.  *See* Loc. R. 105.6.

the written application, *id.* at 5, 8, and that the misrepresentation was not material, *id.* at 14. Additionally, Gary argues that the Court should exclude testimony from one of USAA Life's principal underwriters, Tammy Koenig.  *Id.* at 16.  Gary has not established grounds for excluding the evidence, and the Medical Questionnaire is a part of the application.  Moreover, Ms. Maddox-Gary's misrepresentation, which was material, indeed provides a basis for rescission.  Accordingly, I will grant USAA Life's motion and deny Gary's.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

## Preliminary Matters

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

Fed. R. Civ. P. 56(c)(2).  To establish that the decedent made a misrepresentation and that the misrepresentation was material, USAA Life relies in part on the Medical Questionnaire, as well as Koenig's affidavit and deposition testimony.  Gary challenges the insurer's ability to present the facts it introduces through these documents as admissible evidence.

*Admissibility of Medical Questionnaire*

Gary notes that Ms. Maddox-Gary completed the Medical Questionnaire, Jt. Rec. 28–31, in a telephone interview that "an unidentified third party" conducted, for which her answers were not recorded verbatim, and which she did not see in written form before the Policy issued.  Pl.'s Opp'n & Mem. 6–8.  Gary argues that, although it is "authentic as part of USAA Life's business records . . . , there is incurable hearsay within the document that render[s] the entire document inadmissible."  *Id.* at 5.  He insists that "the truthfulness of the information within the document cannot be presumed absent authentication by the interviewer or the opportunity by Ms. Maddox-Gary to review and adopt the written answers."  *Id.*; *see* Pl.'s Reply 6 (arguing that under Fed. R. Evid. 803(6), the Medical Questionnaire "qualifies as inadmissible hearsay as it lacks trustworthiness").

Yet, as USAA Life correctly asserts, Ms. Maddox-Gary's statements "are not hearsay because USAA does not offer her statements to establish the truth of her assertion that she did not have diagnostic procedures, but rather . . . to establish that the statement was made."  Cover Page to Jt. Ex. 1, ECF No. 36, at 4.  In essence, USAA contends that the document is offered not to prove the truth of the assertions it contains, but rather to show what USAA did in response to having received and relied on those statements (i.e., it issued the policy at the lower premium rate than it would have required had it known the actual facts). A hearsay statement is one made outside of the current court proceeding and that "a party offers in evidence *to prove the truth of*

3

*the matter asserted* in the statement." Fed. R. Evid. 801(c)(2). This case focuses on Ms. Maddox-Gary's *misrepresentation* in the Medical Questionnaire; if what she said were true, or if USAA Life believed that it was true, then USAA Life would not have rescinded the Policy based on her statement, and this case would not be before me. And, because the statement was not true, but USAA mistakenly thought that it was when it issued the policy, it is, so to speak, offered for its non-truth—the antithesis of hearsay. Thus, the misrepresentation is not offered for its truth and simply cannot be hearsay, and is not inadmissible on that ground. *See id.*

The only other contents of the Medical Questionnaire on which USAA Life relies, *see* Def.'s Mem. 2, are the text of Question 8.a, as it appeared in the Medical Questionnaire and in the transcript of Ms. Maddox-Gary's interview, which also is not offered for its truth, and Ms. Maddox-Gary's response that she had her finger x-rayed, which is not disputed. Therefore, insofar as USAA Life relies on the contents of the Medical Questionnaire, Gary's objection that it is inadmissible hearsay is overruled for purposes of this summary judgment analysis. *See* Fed. R. Evid. 801(c)(2).

### *Admissibility of Koenig's Statements*

Gary argues that "[t]he nature of Ms. Koenig's testimony as well as the skill required to conduct her investigation clearly demonstrate that she should have been disclosed as an expert under Red. R. Civ. P. 26(a)(2)(B)," and because USAA Life did not disclose her as an expert witness, her opinion testimony on whether the decedent made a material misrepresentation is inadmissible. Pl.'s Opp'n & Mem. 16. According to Gary, Koenig testified at her deposition that "she was not involved [in] nor did she have personal knowledge of the application []or the underwriting process of the life insurance policy at issue," and that "her involvement in this matter was solely to render an opinion on the final issue in this matter." *Id*. at 17.

USAA Life responds that Koenig is not an expert witness and that her "testimony is not 'opinion' testimony."   Def.'s Reply & Opp'n 13.   In its view, Koenig testified that she input results from Ms. Maddox-Gary's undisclosed echocardiogram into a calculator that "then determined the future risk demonstrated by those measurements." *Id*. at 13–14.   USAA Life insists that Koenig did not exercise her judgment in the process. *Id*.   Alternatively, USAA Life argues that, if her testimony were opinion testimony, it would be admissible lay opinion testimony under Fed. R. Evid. 701. *Id.* at 14.   Defendant asserts that "[t]he testimony USAA intends to elicit from Ms. Koenig is based on her personal knowledge of the circumstances surrounding USAA's decision to rescind the life insurance policy at issue in this case . . . ." *Id*. at 15.

In Gary's view, "while simply plugging in numbers to a calculator may not require any skill, this was just a small step in the much larger process which le[]d Ms. Koenig to her conclusion, a process which clearly requires the ability of an expert."   Pl.'s Reply 4.   He contends that Koenig "was able to read through Ms. Maddox-Gary's medical records and 'interpreted' Dr. Shakoor's notes to determine that an echocardiogram had been scheduled." *Id*.

Koenig testified that she "offered an opinion" with regard to the decedent's Policy "[a]t the time of contestable claim review," after USAA Life had issued the Policy.   Koenig Dep. 5:17–24, Jt. Rec. 80.   She stated that, after "review[ing] the information obtained during the contestable claim review," it was her opinion "[t]hat there was misrepresentation and that the policy would not have been issued at the risk class it was issued." *Id*. at 7:21–8:4, Jt. Rec. 80; *see id.* at 17:17–20, Jt. Rec. 83.   She testified that Ms. Maddox-Gary's failure to disclose her echocardiogram was "material because it changes her policy rating." *Id*. at 37:7–13, Jt. Rec. 88. She acknowledged that she used her "knowledge and experience as an underwriter in making this

determination."  *Id*. at 8:5–15, Jt. Rec. 80.  According to Koenig, she was testifying from her

personal memory as well as her contemporaneous notes.  *Id*. at 21:13–23, Jt. Rec. 84.

Similarly, in her affidavit, Koenig explained how she "conduct[ed] the contestability

review of the claim made on the policy of life insurance issued to Angela Maddox-Gary,"

including reviewing medical records and entering data into a calculator "[t]o determine whether

the results of [an] echocardiogram had any significance for underwriting purposes."  Koenig Aff.

¶¶ 2–9, Jt. Rec. 100–01.  She stated:

> Had USAA Life known of the echocardiogram results at the time that it was
> originally underwriting the policy, Ms. Maddox-Gary would not have been
> offered the policy at the preferred rate.  Rather, the rate would have been 100 –
> 150% of the rate that she paid, based upon the Swiss Re Left Ventricular Mass
> Calculator.

*Id.* ¶ 10.

Federal Rule of Evidence 701 provides that a lay witness may provide testimony that is

"rationally based on the witness's perception," "helpful to clearly understanding the witness's

testimony or to determining a fact in issue," and "not based on scientific, technical, or other

specialized knowledge within the scope of Rule 702."  In *United States v. Roe*, 606 F.3d 180 (4th

Cir. 2010), the Fourth Circuit reiterated its observation of the blurred line between Rule 701 and

Rule 702 testimony from *United States v. Perkins,* 470 F.3d 150, 155–56 (4th Cir. 2006):

> We have previously recognized that the distinction between lay and expert
> testimony "is a fine one" and "not easy to draw." In describing this tension, we
> have observed:
>
> > While we have noted that a critical distinction between Rule 701
> > and Rule 702 testimony is that an expert witness must possess
> > some specialized knowledge or skill or education that is not in
> > possession of the jurors, we also have acknowledged that the
> > subject matter of Rule 702 testimony need not be arcane or even
> > especially difficult to comprehend. The interpretive waters are
> > muddier still: while lay opinion testimony *must* be based on
> > personal knowledge, expert opinions may also be based on first
> > hand observation and experience.

*Roe*, 606 F.3d at 185–86 (quoting *Perkins,* 470 F.3d at 155–56 (internal quotation marks omitted)). In *Perkins*, the Fourth Circuit observed that the addition of subsection (c) "did not work a sea change to the rule," but rather "'serves more to prohibit the inappropriate admission of expert opinion under Rule 701 than to change the substantive requirements of the admissibility of lay opinion.'" *Id.* at 155 & n.8 (quoting *United States v. Garcia,* 291 F.3d 127, 139 n.8 (2d Cir. 2002)).

In *Roe*, 606 F.3d 180, in appealing his conviction, Roe argued that the district court should not have allowed the Government's witness Sergeant Russell, who had not been designated or qualified as an expert, "to testify about the authority possessed by the holders of a Maryland private detective and security guard certification and a handgun permit" because, in Roe's view, "Sergeant Russell's testimony constituted 'expert' testimony." *Id.* at 185. The Fourth Circuit disagreed with Roe, concluding that "the district court did not err in admitting [Sergeant Russell's testimony] as lay testimony." *Id.* It reasoned:

> Sergeant Russell was in charge of the unit that issues handgun carry permits, as well as security guard and private detective certifications in Maryland. He was qualified to testify as to the requirements for getting such permits and certifications and to state what possessing those permits permitted an individual to do based on his personal knowledge acquired in that capacity. Such knowledge was not "specialized knowledge" in the Rule 702 sense, and does not constitute expert testimony. Instead, it falls under Rule 701's description of lay testimony, being "rationally based on the perception of the witness" and helpful to the jury's "determination of a fact in issue."

*Id.* at 185–86 (quoting *Perkins*, 470 F.3d at 155–56 (internal quotation marks omitted)).

*MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990),[2] also provides guidance. There, the defendant offered Lillian Harrison, the accountant for a

---

[2] Some care needs to be taken when citing cases discussing the scope of Rule 701 that were issued before 2000. Prior to the amendments to the rule in 2000, there were only two elements required to admit lay opinion testimony. It had to be rationally based on the witness's

corporation with which the defendant worked, as a lay witness to testify about the corporation's

profits. The Fourth Circuit concluded that the district court erred in ruling that Harrison's

testimony "constituted expert testimony" and that, because she was not designated as an expert,

her testimony was inadmissible. The appellate court reasoned:

> In ruling Harrison's testimony inadmissible, the district court failed "to
> distinguish between opinion testimony which may be introduced by lay witnesses
> and that which requires experts." "The modern trend favors the admission of
> opinion testimony, provided that it is well founded on personal knowledge [as
> distinguished from hypothetical facts] and susceptible to specific cross-
> examination. A lay witness in a federal court proceeding is permitted under Fed.
> R. Evid. 701 to offer an opinion on the basis of relevant historical or narrative
> facts that the witness has perceived."

*MCI Telecomms.*, 897 F.2d at 706 (quoting *Teen–Ed, Inc. v. Kimball International, Inc.,* 620

F.2d 399, 403 (3d Cir.1980) (citing 3 J. Weinstein, Evidence, ¶ 701[02] at 701–9 and 701–17

(1978))) (footnote omitted).

> The Fourth Circuit compared the facts before it to those in *Teen–Ed*, where

> the party's accountant, even though . . . not identified before trial as an expert
> witness under Rules 702 and 703, was permitted to testify as a lay witness on the
> basis of facts and data perceived by him in his capacity as an accountant and
> bookkeeper and to submit a projection of profits based on such records.

*Id.* The court concluded that the facts were "substantially" the same, observing:

> Harrison was the bookkeeper. She was testifying on the basis of records kept by
> her personally under her control, and her projection of profits under the lease as
> prepared by her was predicated on her personal knowledge and perception. As
> such she was a lay witness, whose identification as an expert witness under Rules

---

perception, and helpful to the factfinder. *See Garcia*, 291 F.3d at 139 & n.8; Fed. R. Evid. 701 (1987). In 2000, the third element was added, requiring that in addition to the original two elements, the lay witnesses' opinion could not be based on scientific, technical or specialized knowledge "within the scope of" Rule 702 (the expert witness rule). This further circumscribed the type of opinions that a lay witness could offer. But, as noted, the line separating lay and expert opinion is not so easy to distinguish and the intent of the 2000 amendment was not to "work a sea change to the rule." *Perkins*, 470 F.3d at155 n.8. Accordingly, pre-2000 cases discussing the scope of Rule 701 still have value in determining the kinds of opinion testimony traditionally thought not to be "within the scope" of the expert witness rule, Rule 702.

> 702 and 703 was not required. That was precisely what was held in *Teen–Ed* and
> we agree. The district judge erred in refusing to permit Harrison to testify.

*Id.*; *see also United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 455 (4th Cir. 2011)

(concluding that witness's testimony was admissible lay testimony where witness was owner of

financial planning and tax accounting business who "provided accounting services to IIF, and . . .

also worked with IIF on its application to secure [a] contract" and he "testified generally about

how the GSA contracting process worked and about his efforts to held IIF obtain [that] contract

. . . . based on his personal knowledge and understanding of the contracting system that was

derived from his years of experience with government contracting").

Here, Koenig, who "review[s] about one or two [contestable claims] a month" for USAA

Life, Koenig Dep. 21:20–23, Jt. Rec. 84, describes how contestable claim review works, her role

in the process, and her role in the review of the decedent's Policy in particular.  This lay

testimony that is based on Koenig's personal knowledge and experience working for USAA Life

and on this claim clearly is admissible under Rule 701.  *See Ubl*, 650 F.3d at 455; *MCI

Telecomms.*, 897 F.2d at 706; *Roe*, 606 F.3d at 185–86. She is not applying "principles and

methods to the facts of the case," *see* Fed. R. Evid. 702(d), but rather recounting her previous

application of certain procedures to explain how USAA Life reached its decision to rescind the

decedent's Policy.  *See United States v. Lloyd*, 645 F. App'x 273, 280 (4th Cir.), *cert. denied,*

137 S. Ct. 213 (2016) (expert testimony is testimony from a witness "qualified by 'knowledge,

skill, experience, training, or education,'" and it is testimony "'based on sufficient facts or data'

produced by reliable principles and methods that have been reliably *applied to the facts of the

case*" (quoting Fed. R. Evid. 702(a)-(d)) (emphasis added)).  Moreover, her opinion on how

knowledge of Ms. Maddox-Gary's echocardiogram results would have changed the rate she

received on her Policy is admissible as lay opinion testimony based on Koenig's personal

knowledge—not of the decedent's original application process but rather of the contestable claim review process—and Koenig's participation in USAA Life's business on a day-to-day basis. *See Ubl*, 650 F.3d at 455; *MCI Telecomms.*, 897 F.2d at 706; *Roe*, 606 F.3d at 185–86; *Columbia Gas Transmission LLC v. Tri-State Airport Auth.*, No. 14-11854, 2016 WL 1737120, at \*4 (S.D. W. Va. May 2, 2016) (concluding that it had properly admitted lay opinion testimony where the witness was "explaining why he removed organic material" and his testimony was "based on knowledge and participation in the day to day affairs of slope repair work").

Certainly, Koenig later testified that, in her opinion, when the decedent "simply reveal[ed] that she had a physical," her statement "did not indicate that she may have had an EKG or echocardiogram." Koenig Dep. 34:1–10, Jt. Rec. 87. And she testified that, in her opinion, Ms. Maddox-Gary knew what an echocardiogram was. *Id.* at 34:24 – 35:16, Jt. Rec. 87. This opinion testimony is not based on Koenig's personal knowledge and is inadmissible, and I will not consider it in ruling on the pending motion.[3] *See* Fed. R. Evid. 701, 702.

---

[3] Plaintiff also argues that Koenig's affidavit cannot be considered because USAA failed to disclose Koenig's opinions as required by Fed. R. Civ. P. 26(b)(2)(B). Pl.'s Opp'n & Mem. 16. Plaintiff is mistaken, because Rule 26(b)(2)(B) only requires disclosure of opinions and their bases from those witnesses "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." But, as already discussed, Koenig's affidavit is offered under Rule 701, not Rule 702, and Rule 26(b)(2)(B) disclosures are not required from witnessed providing lay opinion testimony. Plaintiff does not argue that USAA should have disclosed Koenig's lay opinions under Rule 26(b)(2)(C), but that rule, too, applies only to opinions expressed under Rule 702, 703, or 705, not 701. Thus, there was no failure by USAA to make disclosures required by Rule 26(a)(2).

**Factual Background**[4]

On December 11, 2012, Angela Maddox-Gary completed and electronically signed a written application for a life insurance policy from USAA Life.  Jt. Stmt. of Facts, Def.'s Mem. 1; *see also* Pl.'s Opp'n & Mem. 1; Written Application, Jt. Rec. 22–26.  Then, "[a]s part of the application process, Ms. Maddox-Gary participated in a verbal recorded medical questionnaire" on December 14, 2012.  Jt. Stmt. of Facts, Def.'s Mem. 1; *see also* Pl.'s Opp'n & Mem. 1. To complete the questionnaire, Ms. Maddox-Gary answered questions in a phone interview conducted by a third party, and the interviewer input her responses into "some software" that "created" the Medical Questionnaire.  Koenig Dep. 15:5–8, 27:16 – 28:24, Jt. Rec. 82, 85.  The interviewer did not record Ms. Maddox-Gary's responses verbatim.  *Id.* at 27:16 – 29:10, Jt. Rec. 85–86.  Ms. Maddox-Gary answered questions "to the best of [her] knowledge."  Interview Tr. 26, Jt. Rec. 68.  She verbally signed, but did not read, the Medical Questionnaire before USAA Life issued the Policy.  Koenig Dep. 29:11–23, Jt. Rec. 86; *see* Med. Questionnaire, Jt. Rec. 28–30; *see also* Interview Tr. 3, Jt. Rec. 45. USAA Life attached the completed Medical Questionnaire to the Policy and viewed it as "part of the application."  Med. Questionnaire, Jt. Rec. 30; *see also* Interview Tr. 2, Jt. Rec. 44 (stating that interviewer was "gathering the required information regarding [Maddox-Gary's] medical history and lifestyle in order to complete [her] insurance application" and "[a]s part of this process [the interviewer] need[ed] to ask [her] questions and record [her] answers for the USAA underwriting department").

---

[4] Because the parties filed cross-motions for summary judgment, "'each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant.'" *Lynn v. Monarch Recovery Mgmt., Inc.*, No. WDQ-11-2824, 2013 WL 1247815, at *1 n.5 (D. Md. Mar. 25, 2013) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003)). Although Gary challenges the admissibility of the Medical Questionnaire and Koenig's opinion testimony, neither party contests the facts presented in the opposing briefs.

In the interview, Ms. Maddox-Gary stated that she had "a heart murmur" that was diagnosed "[w]hen [she] was six years old," that she had no "symptoms or problems experienced with the murmur," and that it did not cause shortness of breath or limit her physical activities. Interview Tr. 10–12, Jt. Rec. 52–54.   As part of the interview, she was asked Question 8.a: "Have you in the past five years had an electrocardiogram, x-ray or any other diagnostic test or procedure not previously discussed?" Interview Tr. 19, Jt. Rec. 61. Ms. Maddox-Gary stated that she "had an x-ray on [her] finger," *id.*, but when asked "Any other diagnostic test or procedure," she answered "No," *id.* at 21, Jt. Rec. 63.   On the Medical Questionnaire, next to the question, ""Has any insured, within the last five years: a. had an electrocardiogram, X-ray or any other diagnostic test or procedure that was not previously disclosed?" the box "Yes" was checked. Med. Questionnaire, Jt. Rec. 29.   The continuation sheet indicated that she had an "X-RAY" taken of her "FINGER."   *Id.*, Jt. Rec. 31.   Ms. Maddox-Gary did not reveal at that time, or earlier in the interview, that she had an echocardiogram on January 31, 2011.   Interview Tr., Jt. Rec. 44–72; Koenig Aff. ¶¶ 4–5, Jt. Rec. 100, Echocardiogram Rpt., Jt. Rec. 107–08.

> USAA Life issued a policy of life insurance to Ms. Maddox-Gary, effective February 1, 2013. The policy was issued in the amount of $100,000.00, and provides for interest from the date of death at the legal rate, which is 6% per annum. The policy issued to Ms. Maddox-Gary was offered at the preferred rate.
>
> Ms. Maddox-Gary died December 27, 2013, while within the two-year contestability time-period under the policy. At the time of Ms. Maddox-Gary's death, the policy was in force and the premium paid. The Medical Examiner's Report recorded the cause of death as related to ischemic heart disease. The beneficiary under the policy, Robert Gary, made a timely claim for benefits.

Jt. Stmt. of Facts, Def.'s Mem. 1–2; *see also* Pl.'s Opp'n & Mem. 1–2.

USAA Life directed one of its principal underwriters, Tammy Koenig, to "perform[] an investigation during the contestability period." Jt. Stmt. of Facts, Def.'s Mem. 2; *see also* Pl.'s Opp'n & Mem. 2; Exhibit 4, Koenig Aff. ¶ 2, Jt. Rec. 100.  Through the investigation, in which

USAA Life obtained Ms. Maddox-Gary's medical records, including the results of the decedent's January 31, 2011 echocardiogram, the insurer learned about that echocardiogram. Koenig Aff. ¶¶ 3–5, Jt. Rec. 100. "To determine whether the results of the echocardiogram had any significance for underwriting purposes, [Koenig] consulted the Swiss Re underwriting guidelines, USAA Life's underwriting manual of record." *Id.* ¶ 6. Koenig explained:

> The Swiss Re guidelines instructed me to use the Left Ventricular Mass Calculator to assess the results of the echocardiogram.
>
> . . . The Left Ventricular Mass Calculator contains fields into which a portion of the results of the echocardiogram are inserted. Based on the input from the echocardiogram report, the calculator provides a response answering whether the information from the echocardiogram affects the rating of the policy.

*Id.* ¶¶ 7–8. Koenig "populated the fields requested by the calculator with the results from the echocardiogram," including "the left ventricular interior dimension (LVID), the posterior wall thickness (PWT), and the septal wall thickness (SWT)," as well as "Ms. Maddox-Gary's height and weight." *Id.* ¶ 9. Based on that data, "[t]he calculator determined that, under the Swiss Re underwriting guidelines, the premium was increased by 100 - 150%." *Id.*

After entering the decedent's data into the calculator, Koenig "provide[d] [her] opinion" to her superiors that "the policy was not issued at the correct class," and the "claims executive" decided to deny Gary's claim. Koenig Dep. 17:19–20, 19:8–19, 45:8–16, Jt. Rec. 83, 90. USAA Life notified Gary by letter on September 22, 2014 that "it was denying his claim and rescinding the policy." Jt. Stmt. of Facts, Def.'s Mem. 2; *see also* Pl.'s Opp'n & Mem. 2. It "returned the premium to Mr. Gary by check, but the check has not been negotiated." *Id.*

According to Koenig, if Ms. Maddox-Gary had disclosed that she had an echocardiogram in January 2011, "records would have been obtained" for USAA Life to consider the results. Koenig Dep. 37:2–10, Jt. Rec. 88. Further,

> Had USAA Life known of the echocardiogram results at the time that it was originally underwriting the policy, Ms. Maddox-Gary would not have been offered the policy at the preferred rate.  Rather, the rate would have been 100 – 150% of the rate that she paid, based upon the Swiss Re Left Ventricular Mass Calculator.

Koenig Aff. ¶ 10.  In Koenig's view, Ms. Maddox-Gary's failure to disclose her echocardiogram in response to Question 8.a was "material because it change[d] her policy rating."  Koenig Dep. 37:7–13, Jt. Rec. 88.

## Discussion

Under Maryland law,[5] "a material misrepresentation in the form of an incorrect statement in an application invalidates a policy issued on the basis of such application."  *Fitzgerald v. Franklin Life Ins. Co.*, 465 F. Supp. 527, 534 (D. Md. 1979) (citing *Hofmann v. John Hancock Mutual Life Ins. Co.*, 400 F. Supp. 827, 829 (D. Md. 1975); *Mutual Life Ins. Co. v. Hilton-Green*, 241 U.S. 613 (1916)), *aff'd*, 634 F.2d 622 (4th Cir. 1980).  Specifically, the Maryland Insurance Code provides that, with regard to "[s]tatements in applications for life . . . insurance":

> A misrepresentation, omission, concealment of facts, or incorrect statement does not prevent a recovery under the policy or contract unless:
>
> (1) the misrepresentation, omission, concealment, or statement is fraudulent or material to the acceptance of the risk or to the hazard that the insurer assumes; or
>
> (2) if the correct facts had been made known to the insurer, as required by the application for the policy or contract or otherwise, the insurer in good faith would not have:
>
> . . .
>
> (ii) issued the policy . . . at the same premium or rate . . . .

Md. Code Ann., Ins. § 12-207(b).  Pursuant to this statute, "[t]he insurer may avoid the policy regardless of whether the material misrepresentation is made intentionally, or through mistake and in good faith." *Fitzgerald*, 465 F. Supp. at 534.  USAA Life moves for summary judgment

---

[5] The parties agree that Maryland law governs.  *See* Def.'s Mem. 6 n.6; Pl.'s Opp'n & Mem. 2.

on the basis that "Ms. Maddox-Gary's failure to disclose that she had undergone an echocardiogram in the year previous to her application was material," and therefore "the insurer [was] entitled to deny coverage on [the] claim." Def.'s Mem. 7.

To determine whether USAA Life was permitted to rescind the Policy under the statute, the Court considers two factors. *Fitzgerald*, 465 F. Supp. at 534. "First, the Court must decide whether a misrepresentation occurred." *Id.* at 534–35 (citations omitted). The burden is on the insurer "to establish fraud or misrepresentation by the insured in the application for insurance," but "Maryland law still imposes a heavy burden on the applicant to be responsible for all statements in or omissions from the application submitted by him." *Id.* at 535. Second, "the Court must determine whether the misrepresentation was material to the risk assumed by the insurer." *Id.*

Gary argues that, regardless whether a misrepresentation occurred or it was material, "under [Md. Code Ann., Ins.] § 16-216, USAA Life cannot declare the policy void for medical attention [namely the January 31, 2011 echocardiogram] given prior to February 1, 2011," more than two years before the Policy issued. Pl.'s Opp'n & Mem. 4–5. Certainly, § 16-216 provides that a life insurance policy "may not contain . . . a provision that gives the insurer the right to declare the policy void because the insured has had a disease or ailment, whether specified or not, or has received institutional, hospital, medical, or surgical treatment or attention," unless "the insured has received institutional, hospital, medical, or surgical treatment or attention within 2 years before the policy was issued" and "the insured or a claimant under the policy fails to show that the condition occasioning the treatment or attention was not serious or was not material to the risk." Ins. § 16-216(a)(2). But, this provision simply is not relevant: USAA Life declared the Policy void because Ms. Maddox-Gary *failed to disclose* the echocardiogram and

the insurer considered that to be a material omission, not because she *had* the echocardiogram. *See* Koenig Dep. 37:7–13, Jt. Rec. 88.   Indeed, Koenig testified that, had the insurer known about the echocardiogram, it still "would have offered her the policy," but at an increased premium. *Id.* at 39:7–13, Jt. Rec. 88.   Therefore, I will turn to the factors.

### 1. *Misrepresentation in insurance application*

The parties agree that Ms. Maddox-Gary made a misrepresentation, but as Gary sees it, Ms. Maddox-Gary's response to Question 8.a simply was not a statement *in* a life insurance application, and "§ 12-207(b)(2) only permits policy voidance for misrepresentations made on the application itself."[6]  Pl.'s Opp'n & Mem. 6–7.  It is true that the question in response to which Ms. Maddox-Gary should have disclosed the echocardiogram was on the Medical Questionnaire, not the Written Application.  Yet, the Medical Questionnaire was a part of the application, not an unrelated document or an alteration that would be impermissible under Ins. §12-206(c)(1), as Gary insists, *see id.* at 8.  As USAA Life asserts:

> at the outset of the interview during which the Questionnaire was completed, the interviewer stated:
>
>> I will be assisting you with your telephone interview, and it's my goal to provide an excellent member experience in gathering the required information regarding your medical history and lifestyle *in order to complete your insurance application*[.] As part of this process I need to ask you questions and record your answers for the USAA underwriting department. . . . Upon completion of the interview, USAA will request that you provide a

---

[6] Gary relies on the language of subsection (b)(2), but § 12-207(b) is disjunctive: a policy can be rescinded based on a material misrepresentation, Ins. § 12-207(b)(1), *or* based on facts that the insurer elicited in the application that would have caused the insurer to charge a higher premium, Ins. § 12-207(b)(2)(ii).  Section 12-207(b)(1), unlike (b)(2), is not limited to facts "required by the application."  Nonetheless, the statute itself is titled "Statements *in applications* for life or health insurance or annuities." Ins. § 12-207 (emphasis added).  Thus, both subsections apply to statements *in* life insurance applications, and Gary's argument applies whether the failure to disclosed is categorized as a material misrepresentation under subsection (b)(1) or a fact the disclosure of which would have changed the premium under subsection (b)(2)(ii).

> recorded voice signature. This confirms that you agree with the accuracy and completeness of your answers. The voice signature will save significant amounts of time by eliminating the need to obtain an ink signature and eliminating the need to mail paper documents back and forth. USAA can then begin to process your application much faster. Do I have your permission to proceed on this basis?

> ([Interview Tr., Jt. Rec.] 44-45 (emphasis added)). Ms. Maddox Gary answered, "Yes." (Id.). Accordingly, before the interview began, Ms. Maddox-Gary was aware that the answers she gave would be recorded on the Questionnaire, that those answers were part of her application, and that her application would be relied upon by USAA as the basis of any policy thereafter issued.

Def.'s Reply & Opp'n 5. Defendant correctly concludes that "[t]he representations Ms. Maddox made during the interview, as recorded on the Questionnaire, were part of her application." *See id.* Therefore, the decedent's failure to disclose the echocardiogram was a misrepresentation in the insurance application.

Yet, "failure to disclose information is grounds for rescission only if the application form was 'reasonably designed to elicit from the applicant the information which was material to the risk.'" *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 777–78 (4th Cir. 1990) (quoting *People's Life Ins. Co. v. Jerrell,* 318 A.2d 519, 522 (Md. 1974)). And, "[i]f the application form prepared by the insurance company is ambiguous, it must be construed in a manner favorable to the policyholder." *Fitzgerald*, 465 F. Supp. at 535. Gary argues that the misrepresentation cannot provide grounds for rescission because Question 8.a on the Medical Questionnaire, as asked in the interview ("Have you in the past five years had an electrocardiogram, x-ray or any other diagnostic test or procedure not previously discussed," with the follow-up question, "Any other diagnostic test or procedure," Interview Tr. 19, 21, Jt. Rec. 61, 63), was "improperly phrased and ambiguous." Pl.'s Opp'n & Mem. 13. He questions the phrasing, specifically that the interviewer used the word "discussed," where the transcript called for the world "disclosed," because the decedent previously had stated that she did not have an echocardiogram for her heart

murmur.  *Id.*; *see* Interview Tr. 11, Jt. Rec. 53.  Additionally, Gary argues that the question is ambiguous because it referred to "other *diagnostic* tests," while the echocardiogram was to monitor an already-diagnosed condition.  Pl.'s Opp'n & Mem. 13 (emphasis added).

As noted, Question 8.a of the Medical Questionnaire interview was "Have you in the past five years had an electrocardiogram, x-ray or any other diagnostic test or procedure not previously discussed," with the follow-up question, "Any other diagnostic test or procedure?"  Interview Tr. 19, 21, Jt. Rec. 61, 63.  There is no ambiguity in this language.  It asks whether Ms. Maddox-Gary had an echocardiogram that she did not already mention.  While Ms. Maddox-Gary previously mentioned *not* having an echocardiogram for her heart murmur, she had not previously mentioned *having* an echocardiogram.  Moreover, the question was "reasonably designed to elicit from the applicant" the fact that she had an echocardiogram in January 2011.  *See Parker*, 900 F.2d at 777–78 (quoting *Jerrell*, 318 A.2d at 522).

Gary argues that it is "difficult to believe that an errant or mistaken response would be considered a misrepresentation warranting voidance of the policy," because Ms. Maddox-Gary only was asked to answer the interview questions, including Question 8.a, "to the best of [her] knowledge."  Pl.'s Opp'n & Mem. 9.  Gary does not cite any authority in support of his position, and I have not identified any Maryland law providing that a statement made to the best of an applicant's ability cannot constitute a misrepresentation for purposes of voiding an insurance policy.[7]

---

[7] In Virginia, "where a policy contains a recitation that the applicant's answers are correct to the best of his knowledge . . . the insurer must also show that his answers are knowingly false." *Van Anderson v. Life Ins. Co. of N. Am.*, No. 11-CV-50, 2012 WL 1077794, at *9 (W.D. Va. Mar. 30, 2012) (citing *Old Republic Life Ins. Co. v. Bales,* 195 S.E.2d 854, 856 (Va. 1973)).  But, even under this heightened standard, what the insurer must show is "that the applicant was aware or should have been aware of the fact in question based on the circumstances." *Id.* at *11.  In *Van*

As for the fact that the decedent did not have the opportunity to review the Medical Questionnaire before the Policy issued, I note that, at the outset of the interview, she consented to "provide a recorded voice signature" to "confirm that [she] agree[d] with the accuracy and completeness of [her] answers" to "eliminate the need to mail paper documents back and forth" and allow USAA Life to "begin to process [her] application much faster." Interview Tr. 3, Jt. Rec. 45. The Maryland Court of Appeals has held that to sign an insurance "application without reading it and without its being read to" the insured is "inexcusable negligence," because when an applicant signs an application, she is "bound to know what she signed." *Metro. Life Ins. Co. v. Samis*, 192 A. 335, 338–39 (Md. 1937). Further, "[t]he law requires that the insured shall not only, in good faith, answer all the interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written. It is for his interest to do so, and the insurer has a right to presume that he will do it." *Id.* at 339. Indeed,

> Even where there has been a material misrepresentation by an agent without the initial knowledge of the insured, if the insured "has the means to ascertain that the application contains false statements, he is charged with the misrepresentations just as if he had actual knowledge of them and was a participant therein."

---

*Anderson*, after reviewing the medical records in the record, the court found that, when the insured completed the application on November 10, 2008, "[a]s a matter of common sense, he certainly would have been aware of the fact that he was taking Ativan for anxiety" and "also certainly would have been aware of the battery of tests [including x-rays, blood tests, urinalyses, ultrasounds, and CT scans] that he personally underwent on February 26, March 19, March 20, March 27, and June 6, 2008." *Id.*

Likewise, here, the evidence is undisputed that Ms. Maddox-Gary had an echocardiogram on January 31, 2011 and completed the Medical Questionnaire on December 14, 2012, less than two years later. The echocardiogram was not one of many tests that Ms. Maddox-Gary underwent over the course of those two years; the only other test she identified was an x-ray of her finger. Clearly, Ms. Maddox-Gary knew or should have known that she had that echocardiogram. As noted, "Maryland law . . . imposes a heavy burden on the applicant to be responsible for all statements in or omissions from the application submitted by him." *Fitzgerald*, 465 F. Supp. at 535. Thus, even if the standard applied, under these circumstances, the decedent's answer was knowingly false. *See Van Anderson*, 2012 WL 1077794, at *11.

*Shepard v. Keystone Ins. Co.*, 743 F. Supp. 429, 433 (D. Md. 1990) (quoting *Parker*, 900 F.2d at

778 n. 7 (quoting *Serdenes v. Aetna Life Ins. Co.*, 319 A.2d 858 (Md. Ct. Spec. App. 1974))).

Notably, when Ms. Maddox-Gary received the Policy, with the Medical Questionnaire

attached, she was informed that the "entire contract consist[ed] of" the Policy and "[a]ny

application." Policy 5, Jt. Rec. 10. The Medical Questionnaire stated, above her voice signature

line:

> I have read the above statements and answers and represent that they are
> true and complete and correctly recorded. I agree that such statements shall be
> part of the application and are made with the expectation that USAA LIFE
> INSURANCE COMPANY will consider the information when determining
> whether to issue the policy or contract for which I have applied.

Med. Questionnaire, Jt. Rec. 30. The decedent was directed to "READ [the] POLICY

CAREFULLY." Policy 1, Jt. Rec. 1. And, she was informed that she had the "RIGHT TO

CANCEL" by "return[ing] it within 20 [or more if required by law] days after [she] received it."

*Id.*; *see id.*, Jt. Rec. 40 (stating that insured had 31 days to cancel for full refund). She was

provided with a number to call USAA Life with any questions. *Id.* Under these circumstances,

Ms. Maddox-Gary is presumed to have reviewed the contract she received from the insurer,

including the Medical Questionnaire. *See Samis*, 192 A. at 338–39; *see also Shepard*, 743 F.

Supp. at 433; *Fitzgerald*, 465 F. Supp. at 535.

    *2. Materiality*

The remaining issue is whether the decedent's failure to disclose the echocardiogram was

a material misrepresentation or whether, if Ms. Maddox-Gary had disclosed the echocardiogram,

USAA Life would not have issued the Policy at the same premium. *See* Ins. § 12-207(b)(1),

(2)(ii). "[T]he materiality inquiry focuses on what the insurer's use of the undisclosed

information would have been in determining the life risk of the insured at the time of application

for the policy." *Holsey v. Ohio State Life Ins. Co.*, 39 F.3d 1177, 1994 WL 592750, at *3 (4th Cir. 1994) (quoting *Fitzgerald,* 465 F. Supp. at 535).  Typically, "whether misstatements in an application are false and material to the risk are . . . questions of fact for the jury," but "when the evidence is clear and convincing, or uncontradicted, the court may rule as a matter of law." *People's Life Ins. Co. v. Jerrell*, 318 A.2d 519, 520 (Md. 1974) (citations omitted).

The Fourth Circuit has held that, under Maryland law, where an applicant failed to make an elicited disclosure that he smoked, and the uncontradicted evidence established that the "policy premium would have been substantially higher" had he made the disclosure, "the uncontradicted evidence . . . show[ed] a material misrepresentation sufficient to warrant rescission of the contract by [the insurer]."  *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 778 (4th Cir. 1990).  Similarly, in *Holsey v. Ohio State Life Ins. Co.*, 39 F.3d 1177, 1994 WL 592750, at *3 (4th Cir. 1994), the Fourth Circuit held that the record "clearly establishes a material misrepresentation sufficient to warrant rescission of the contract by Ohio Life" under Maryland law and affirmed summary judgment for the insurer.  There, the insurance applicants had "obtained a lower premium through misrepresentation about Mrs. Holsey's smoking."  *Id.* The court noted that the insurer offered evidence that "had it known of Mrs. Holsey's smoking history, it probably would not have issued the policy, and, if it had, it would have required a substantially higher premium." *Id.*; *see also Chawla v. Transam. Occidental Life Ins. Co.*, 440 F.3d 639, 641 (4th Cir. 2006) (affirming summary judgment for insurer on basis of misrepresentations in life insurance applications where applicant failed to disclose two surgeries and three hospitalizations and did not contend that the undisclosed medical information was immaterial to life insurance application).

Here, USAA Life offers Koenig's statements that if Ms. Maddox-Gary had disclosed the echocardiogram, USAA Life would not have issued the Policy at the same premium, and therefore the misrepresentation was material.  Koenig Dep. 7:21 – 8:4, Jt. Rec. 80; Koenig Aff. ¶ 10.  Gary has not identified any evidence to the contrary.  While he argues that the insurer's knowledge of Ms. Maddox-Gary's heart murmur without requesting her medical records means that the failure to disclose the echocardiogram was not material because the insurer already had a reason to request medical records (to learn more about the murmur), this is not so.  Rather, the insurer established by uncontradicted evidence that the murmur was "considered benign and not worth pursuing the records," Koenig Dep. 32:17–23, Jt. Rec. 86, whereas if Ms. Maddox-Gary had disclosed that she had an echocardiogram in January 2011, "records would have been obtained" for USAA Life to consider the results, Koenig Dep. 37:2–10, Jt. Rec. 88.  Specifically, the underwriter would "follow the guidelines in Swiss Re," Koenig Dep. 25:15–20, Jt. Rec. 85, which, when Koenig followed them, indicated that a higher premium rate category would have applied to the decedent, *id.* at 7:21 – 8:4, Jt. Rec. 80; Koenig Aff. ¶ 10.  Therefore, disclosure of the echocardiogram was material because it would have prompted review of the records and resulted in a different rate.  *See Holsey*, 1994 WL 592750, at *3; *Parker*, 900 F.2d at 778.

Thus, Ms. Maddox-Gary's failure to disclose the echocardiogram was a material misrepresentation that led the insurer to issue the Policy at a much lower premium, and such a material misrepresentation on an insurance application provides grounds for an insurer to rescind the policy and deny a claim.  *See Parker*, 900 F.2d at 778; Ins. § 12-207(b)(1), (2)(ii).

## Conclusion

In sum, the undisputed evidence that would be admissible at trial shows that Ms. Maddox-Gary made a material misrepresentation in her application, which cause USAA Life to

issue the Policy at a lower rate than it would have charged had it known.  Therefore, the insurer had the authority to rescind the Policy and deny Gary's claim.  Accordingly, USAA Life's Motion for Summary Judgment, ECF No. 29, IS GRANTED, and Gary's Cross-Motion for Summary Judgment, ECF No. 32, IS DENIED.  A separate order shall issue.

Dated: <u>January 17, 2017</u>                                          _____/S/_____
                                                                                                Paul W. Grimm
                                                                                                United States District Judge

lyb